**IN THE COURT OF APPEALS OF IOWA**

No. 20-0006
Filed June 17, 2020

**IN THE INTEREST OF B.G.,**
**Minor Child,**

**T.G., Father,**
     Petitioner-Appellee,

**K.M., Mother,**
     Respondent-Appellant.
_____

     Appeal from the Iowa District Court for Pottawattamie County, Eric J. Nelson, District Associate Judge.

     The mother appeals the juvenile court order terminating her parental rights to the child in this private termination action. **AFFIRMED**.

     Jaclyn A. Tackett of Jaci Tackett Law PLLC, Council Bluffs, for appellant mother.

     Amanda Heims, Council Bluffs, for appellee father.

     Ryan M. Dale, Council Bluffs, attorney and guardian ad litem for minor child.

     Considered by Vaitheswaran, P.J., and Mullins and Ahlers, JJ.

**AHLERS, Judge.**

On June 4, 2019, after not having seen her seven-year-old daughter for eighteen months, the mother showed up unexpectedly at the daughter's school and tried to take her under the ruse of having to take the child to an appointment. The mother was not known to school teachers, administrators, or staff, and she had not notified them of her plan to take the child. Nor had the mother notified the father, with whom the child lived since birth. When the mother appeared at the school announcing her plan to take the child, the child did not recognize her. This understandably terrified the child, and she began to cry and physically shake as she tried to get away. School officials called the police and the child's father. The child was not permitted to leave the school with the mother. The mother's excuse for her actions was that taking the child from the school without notifying the father or the school officials was her "only way to get her in my possession."

This incident resulted in the child being placed in counseling, as she developed a fear her mother would reappear at some future time to take her. It was also the final straw that led to the father filing a petition to terminate the mother's parental rights pursuant to Iowa Code chapter 600A (2019). After a hearing, the juvenile court terminated the mother's rights, finding the mother abandoned the child, as abandonment is defined in Iowa Code section 600A.8(3). The mother appeals, claiming the evidence did not support findings that she abandoned the child or termination is in the child's best interests.

## I.    Standard of Review.

We review termination proceedings under chapter 600A de novo. *See In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). As in all termination proceedings, our primary concern is the child's best interest. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601. Though the juvenile court's fact findings are not binding, we give them weight. *See R.K.B.*, 572 N.W.2d at 601. This is especially true with regard to credibility findings. *See id.*

## II.    Background Facts and Proceedings.

The child was born in late 2011. At that time, the mother and father were in a relationship. They continued in that relationship, jointly raising the child in the process. They also jointly raised the mother's older daughter from a previous relationship. In the spring of 2014, the relationship between the mother and father ended. The father moved out and found a new place to live. Both girls lived primarily with the father, even though he was not the father of the older girl.[1] At first, the mother was consistent in exercising her time with the girls on weekends. She became less and less consistent as time went on, often coming up with excuses why she could not take the children or needed to return them early.

This informal arrangement of the father caring for the children the vast majority of the time, with the mother irregularly seeing the girls on the weekends,

---

[1] The father testified that, during this time period immediately following the end of the relationship, he had the girls five to six days per week, with the mother having the girls on the weekends. The mother testified she had the girls four days per week and the father had them the other three days each week. The juvenile court accepted the father's testimony. As this amounts to a credibility finding resolving the conflicting testimony, we give it substantial weight and agree with the juvenile court's finding upon our de novo review.

continued until August 2017. At that time, the mother stopped exercising her time with the child at issue and began having her older child live with her or the maternal grandmother, thus separating the half-siblings.[2] Between August and December 2017, the only two times the mother saw the child was over Thanksgiving and Christmas. After the Christmas 2017 visit, the mother did not see the child again until June 4, 2019, when she unsuccessfully attempted to snatch the child from school, as previously described.

## III. Discussion.

### A. Statutory Grounds.

The petition seeking termination of the mother's parental rights alleged two grounds for termination: (1) abandonment pursuant to Iowa Code section 600A.8(3)(b)[3] and (2) failure to provide financial support pursuant to Iowa Code

---

[2] The testimony of the parties was conflicting as to the reason for this change, with each party asserting the other party insisted on the separation of the half-siblings. We need not resolve this conflicting testimony. Regardless of the reason for the change or who caused it, the fact remains that the mother stopped seeing the child at issue on any type of consistent basis at that time and the two girls stopped seeing each other as well.

[3] Iowa Code section 600A.8(3)(b) sets forth the following ground for termination:

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
>
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of

section 600A.8(4).  The juvenile court found the father established the ground of abandonment but failed to establish the ground of failure to provide support.[4] Therefore, we limit our discussion to the abandonment issue.

Abandonment is defined by statute.  In order to avoid being found to have statutorily abandoned a child, in addition to providing for the child's financial support, a parent must maintain substantial and continuous or repeated contact with the child in the manner described in section 600A.8(3)(b)(1)-(3).  If the parent does not act as described, the "parent is deemed to have abandoned the child." Iowa Code § 600A.8(3)(b); *see also*, *e.g.*, *In re W.W.*, 826 N.W.2d 706, 710-11 (Iowa Ct. App. 2012) (finding a mother abandoned her children after she did not see, communicate with, or financially support them for seven years); *In re G.A.*, 826 N.W.2d 125, 129-30 (Iowa Ct. App. 2012) (finding a father abandoned his child—who was almost five years old when the mother filed the petition—after he did not have or request contact with the child in more than one year); *In re C.A.V.*, 787 N.W.2d 96, 101-02 (Iowa Ct. App. 2010) (finding a father abandoned his child after he had no contact with the child for three years, even though he had repeated

---

parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

The phrase "to abandon a minor child" means a parent "rejects the duties imposed by the parent-child relationship . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child."  Iowa Code § 600A.2(20).

[4] Although the mother contributed very little financially and is behind on her court-ordered child support obligation, the juvenile court noted the mother's lack of employment and reliance on others for support.  The juvenile court found the father failed to establish the mother had the ability to pay more than she paid.  On our de novo review, we agree with this finding.  Furthermore, the father has not raised any issue on appeal regarding the juvenile court's decision to deny termination on the ground of failure to provide financial support.

contact during the child's first thirteen months of life and he was current on his child support obligations at the time of the hearing).

In this case, the mother did not meet her obligations for maintaining substantial and continuous or repeated contact with the child. The evidence clearly and convincingly established, since December 2017, the mother did not visit the child monthly, did not maintain regular communication with the child or the father, and did not openly live with the child for a period of six months within the one-year period immediately preceding the termination hearing. *See* Iowa Code § 600A.8(3)(b)(1)-(3).

The mother tries to excuse her lack of contact by claiming: (1) the father physically abused her, which made her fearful to contact him; (2) her mental-health issues were triggered by communication with the father; (3) she was physically and financially unable to visit or contact the child; and (4) the father's placement of conditions on her visits effectively blocked her access to the child. The record does not support any of these claims, as we will explain.

The mother's claim of physical abuse is not supported by the record. The only reference in the record to a claim of violence related to an episode that occurred in 2014. The father testified the couple was in the process of splitting up and the father was gathering clothes at the mother's residence as part of the moving-out process. The father was trying to leave, but the mother wanted to talk, so she held on to his car keys to prevent him from leaving. When the father grabbed his keys out of her hand, the ring of the key chain caught her finger and

reinjured it.[5] The father described the incident as an accident and provided details to support that description.

In contrast, when it came time for the mother's case-in-chief, the mother was asked by her own attorney whether "there [was] domestic violence in [the] relationship with [the father]." The mother answered, "Just really that one time." This response undermines the mother's claim of domestic violence in several ways. First, when given the opportunity to testify about any claims of domestic violence, she provided no details. Second, she did not contradict the father's version of events. In fact, she essentially adopted it by referring to "that one time." The only "time" in the record was the episode in 2014 described by the father, which was characterized as an accident. Based on this record, we find no history of domestic violence. Furthermore, we note that even after "that one time," the mother voluntarily agreed to let both her children live primarily with the father for nearly three and one-half years while she exercised visitation regularly. This suggests any fear of the father she may have had did not prevent her from interacting with him for over three years without incident after the one episode.

As to the mother's claim her mental-health issues prevented her from contacting the father because such contact was a "trigger," the juvenile court made the following findings:

> [A]lthough [the mother] claims her mental health issues would not permit her to contact [the father] about visits, the Court finds the more credible evidence shows that she simply chose not to make an effort to visit [the child], or at least contact [the father], during the past year. She told [the child's guardian ad litem] that [the father] started e-mailing her because she refused to reply to his texts. The Court

---

[5] The mother's pinkie finger was in fragile condition following an injury and surgery as a child.

finds that she did not want to reply to his texts because she did not like the fact that [the father] would place requirements on a visitation schedule geared towards protecting [the child] from further harm.

We defer to the juvenile court's credibility findings. On our de novo review, we make the same findings.

The mother's claim of physical and financial inability is not persuasive. The mother's lack of means and transportation may have excused her from exercising visitation for a time. It did not excuse the mother taking a hiatus from all parenting responsibilities for the better part of two years. This is especially so when the parties lived within fifteen minutes of each other and the father demonstrated a willingness to transport the child and utilize the assistance of the maternal grandmother to facilitate visits. Furthermore, the mother's physical and financial difficulties did not prevent her from telephoning the child, sending letters, or sending cards or even gifts for birthdays and holidays, all of which the mother failed to do on any type of regular basis.

Finally, the father did not block the mother's access to the child. The record is replete with testimony and documentation of text messages showing the father's willingness to cooperate in arranging for the mother to see the child. In fact, the record shows the father actively encouraged the mother's visitation, even when faced with opposition from the child. The only times the father refused visits were on the occasions when the mother made one of her rare requests for a visit and asked to see the child on short notice when the father and the child already had plans. Given the mother's lack of involvement with the child and the last-minute nature of these requests, it was reasonable for the father to deny visitation on those occasions. *See G.A.*, 826 N.W.2d at 129 (holding reasonable restrictions on

visitation after a period of non-involvement by the parent requesting visitation is appropriate). Additionally, even on those rare occasions, the father explained the reason for the denials and offered to arrange a schedule to allow the mother to see the child. The mother never followed up on the offers.

After our de novo review, we agree with the juvenile court that the father established abandonment by clear and convincing evidence.

### B. Best Interest of the Child.

Private termination proceedings under Iowa Code chapter 600A involve a two-step process. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). In addition to proving grounds for termination, the filing party must prove by clear and convincing evidence that termination is in the best interest of the child. *Id.* The mother asserts termination is not in the child's best interest.

The sole basis for the mother's claim that termination is not in the child's best interest is that termination will sever the child's "sibling bond" with her half-sister. While the record contains evidence that the child suffers some ill effects as a result of no longer seeing her half-sister, the record also shows that such relationship has been nonexistent for over two years. As the child's guardian ad litem noted, there is no sibling relationship to maintain.[6] As unfortunate as the circumstance may be, we agree with the guardian ad litem's assessment. We also note the lack of a relationship between the two girls stems from the mother's failure to make any meaningful effort to affirmatively assume the duties encompassed by her role as the child's mother. The mother created the situation that fractured the

---

[6] The child's guardian ad litem recommended termination.

relationship between the two girls; she cannot now use that situation to avoid termination.

To the extent there is a sibling bond to consider, such consideration does not outweigh the other circumstances justifying termination. The father created a stable and loving home for the child and provides for all of the child's needs. He has done so consistently throughout the child's entire life. The father's home includes the father's fiancée, who has assumed a significant parenting role. She has been involved in all aspects of the child's life and desires to adopt her as soon as she is legally able. Likewise, the child desires the father's fiancée to adopt her. The availability of a suitable adoptive stepparent would not be particularly relevant if the mother was actively involved in the child's life. However, given the mother's abandonment of the child, the availability of a stepparent-to-be who is willing to adopt becomes a relevant consideration in the best-interest analysis. *See G.A.*, 826 N.W.2d at 131 (noting a stepparent's willingness to adopt as a favorable consideration in assessing whether termination of parental rights is in the child's best interest).

Following our de novo review of the record, we conclude termination of the mother's parental rights is in the child's best interest.

**AFFIRMED**.